## DERBY vs. DERBY.

1. A party who has negatively violated the marriage contract in its two most vital points, to love and to cherish, and has only performed it in the last and least, to support, comes into a court of equity with an ill grace to complain of a positive breach by the party whom he first injured.

2. A witness should not be allowed to have his direct testimony read to him before cross-examination. Such irregularity is not sufficient to suppress the testimony, but must almost destroy the credibility of the witness.

3. A written confession of adultery, formally sworn to before an author-

ized officer, will have no weight as evidence when made under circumstances which compel the belief that it was not fairly obtained or understandingly made.

4. The testimony of a single witness may be sufficient proof of adultery to sustain a decree of divorce, though denied by the defendant upon oath. But such effect must depend upon the probability of the story, the character of the witness, and consistency of his evidence, and perhaps somewhat on the character of the defendant.

This cause was argued on the final hearing upon bill, answer, replication, and proofs.

*Mr. A. S. Jackson* and *Mr. C. Parker*, for complainant.

*Mr. W. B. Williams* and *Mr. Dixon*, for defendant.

THE CHANCELLOR.

The complainant asks for a divorce from the defendant on the ground of adultery committed by her. The bill charges two acts of adultery, both with William D. Palmer; the first on the steamboat Dean Richmond, on the Hudson river, on the 22d of August, 1866; the second at the house No. 53 Houston street, in the city of New York, on the 27th day of October, in the same year.

The answer denies these charges, and denies that she ever committed adultery with any one. And it further charges that the complainant has at divers times since his marriage with her, committed adultery with Margaret Burst and with Margaret Morrow, otherwise called Margaret Marshall, and with other women whose names were unknown to the defendant.

The parties were married at Jersey City, November 14th, 1854, and have since resided in this state. They have had three children, one of whom, a son, born about 1861, is still living; the two others have died; since June, 1865, the parties have not resided together in the same house. The complainant, who is one of a firm of large lumber dealers in Jersey City, has resided at the principal hotel in that city,

in which he has had apartments. The defendant, with her son, has resided with her mother, at the town of Bergen, about two miles from this hotel. The complainant supported the defendant and his son, and the parties were apparently on amicable terms, visiting each other, and part of the time he called almost daily to see the defendant. He never remained all night, and only once since June, 1865, had marital intercourse with his wife; this was in June 1866, on a visit to her at her room in her mother's house.

In the year 1862 they were living apart; he was for some months boarding with James H. Burst, in Jersey City, in a house which belonged to, or had been hired by the complainant, and the use of which was given to Burst in part compensation for board. The defendant did not board with him, except for about three weeks of the time. The sister of the complainant, a young woman of twenty-six, who was in delicate health, boarded with him. Martha Burst, the sister of James H. Burst, a young woman of nineteen, was one of the family. The complainant was very attentive to Martha Burst; was much with her; he often walked out with her, and escorted her to places of public amusement to which he invited her. He made her presents, one of which was two dresses. She met him in New York, as if by appointment. Her brother, who denies belief of anything criminal in this intercourse, thought that it was indiscreet in her, and might cause scandal, and interfered with both, separately, and endeavored to restrain it. Both resented his interference, and the result was that Burst and his family left the complainant's house. The complainant was for several years in the habit of meeting Martha Burst, and several other girls, who, like her, maintained themselves by sewing, embroidery, or like occupations, at the rooms of the Fidelity Division of the Sons of Temperance, and at their excursions; to neither of these his wife was admitted, she not being a member of the Division. On these occasions he would devote himself for a season to one, and then for another period to another of the girls who were members,

Derby v. Derby.

and in need of escort and attendance. This was done in such a manner as to attract the observation of others.

The defendant, at her marriage, was about twenty-one years of age, and had before been a teacher in the principal public school in Jersey City. A large number of witnesses who had known her for years, both before and since her marriage, testify that both her conduct and reputation for modesty and chastity, has always been beyond suspicion and without reproach, before these charges now made by her husband. Several testify that she was a fond and submissive wife, always anxious to please her husband and sacrificing everything to his wishes. And her conduct in quietly submitting to the mode of life to which he subjected her, would seem strongly to confirm this testimony.

The complainant, for more than a year before the injury of which he complains, had, in effect, deserted his wife, and neglected or omitted the main duties and obligations of the contract of marriage, of the breach of which he now complains. He indeed supported her and visited her, but he separated himself from her society and the enjoyment of a common home. His leisure and amusements were shared with others, and he denied the marital rights which, by every principle of law or duty, he was bound to yield. Neither his means or his business prevented him from allowing her to share his apartments with him and their only child, or from maintaining a common home at the place to which he had exiled her. There is no reason for this conduct shown, and it was his duty in presenting himself before the court for relief, to have shown, if practicable, that his conduct in this respect was not without excuse. His gallantry and attentions to a few of the female members of the Fidelity Division, might have been accounted for and excused by their common devotion to the important cause of temperance reform, if it had not been accompanied or followed by a total neglect of his duties to his wife. The neglect of a husband to perform his duties to his wife, although it may be a natural and the real cause of her infidelity, will not

justify or excuse it; it will hardly palliate the crime. But a party who has negatively violated a solemn contract in its two most vital parts, to love and cherish, and has only performed it in the last and least, to support, comes into a court of equity with an ill grace to complain of a positive breach by the party whom he first injured. His hands are not unclean in the sense which would apply if he had committed the same crime, but they are so weakened, blanched, and attenuated by willful non-performance, that they take but feeble hold on the horns of the altar of justice. Such a complainant cannot expect any favorable leaning of the court, but must present a case free from any reasonable doubt.

The first act charged against the defendant is upon the Dean Richmond, on its passage from Albany to New York, on the night of the 22d of August, 1866. The defendant at that time was boarding at Rhinecliff, on the Hudson, at a hotel kept by John Crandall, whose wife was the complainant's sister. The complainant charges that she left the hotel on the false pretence of going to New York, when she really left for the purpose of going to Albany to meet W. D. Palmer, according to an appointment made with him, and that she occupied the same state-room with Palmer, and there committed adultery. She admits that she left the hotel under the false pretence for the purpose of coming down on the boat, but states that her object was to watch her husband, whom she expected would come down the river that night, and who, she had been informed, generally was accompanied by some woman. The false pretence was used because she would not avow to her husband's sister her real object. She states that she did not find her husband, but found on the boat Mr. Palmer, a man whom she had known, and whose wife she had visited; that he procured a state-room for her, carried her shawl and other articles to it for her, but did not go in and stay all night, or any considerable time, but came in it in the morning before she had left it, and took her traveling bag out for her.

The evidence on the part of the complainant, if it is

entitled to be received and believed, shows a state of facts entirely different, and such as can leave no doubt of her guilt. The great question is as to the weight to be given to this evidence.

Palmer was a partner or clerk in a firm which occupied the second floor of the store No. 53 Chambers street, New York. He, with his wife, had boarded with a Mrs. Loveland, at No. 40 or 140 Barrow street, Jersey City, a place between and about equi-distant from the rooms of the complainant and Clifton Place, in Bergen, where the defendant lived. The defendant had visited Mrs. Palmer in Barrow street; this is shown by Horace A. Crandall, a nephew of the complainant, and the book-keeper of his firm, called by him as a witness. Palmer had been once or twice that summer at Rhinecliff Hotel. At one of these visits he staid all night, and about seven o'clock tapped at the door of the defendant's room and went in, in presence of a chambermaid at work on the stairs, but under circumstances in which no crime or even impropriety can be inferred. He had sent a note informing the defendant of this intended visit, which was abstracted from her trunk by Mrs. Crandall, at the complainant's request, and is in evidence. I see nothing in this note indicating any impropriety, except by putting upon certain expressions a fanciful meaning, which there is no warrant for doing. No other, not the slightest impropriety of conduct of the defendant with Palmer or any one else, is shown to have occurred by any evidence in the cause. An envelope not used, directed in his own hand writing to Palmer, at the Delavan House, Albany, was found in her trunk, and taken out by Mrs. Crandall with the letter. But this can as well be accounted for by an intention to communicate with Palmer when there, as to her husband's movements, as to communicate with regard to her own or Palmer's movements. She would hardly have left these papers, if the instruments of her own crime, in an open trunk, subject to the inspection of her husband, who visited the Rhinecliff Hotel, and always open to the scrutiny of his sister.

With this previous character of the defendant, this history of her acquaintance with Mr. Palmer, we come to the evidence of the adultery on the Dean Richmond.

The testimony which I will first examine is that of Sarah L. Penny, at the time Sarah L. Morrow; she has since married; she was a cousin of the defendant. She, at the request of the defendant, about August 20th, asked defendant in presence of Mrs. Crandall, to accompany her to New York. This was done lest Mrs. Crandall or her daughter should offer to accompany her, and so frustrate the object in view. It was understood between the witness and the defendant, that they should go together to the next station south, when defendant should get out, and alone take the up train to Albany to meet some one on board the night boat, whose name she did not tell. She says now, it was to meet her husband unawares. Defendant and Sarah met the next day at Desbrosses Street Ferry, as they had agreed, and came over to Jersey City, found the complainant, who got a carriage and drove them to her mother's. At this meeting, or some time after, Sarah Penny says the defendant told her that the man she went to meet was Mr. Palmer. That she was afraid Derby should know it. She said there was no harm in it, but if Derby knew it he would want a divorce. That Palmer had taken the state room in Derby's name, and remained in her state room quite late. Derby took his wife and Sarah Penny back to Rhinecliff on Saturday, the 25th, and during these two days or at some other time, the witness is not able to recollect which, she told to Derby, who inquired particularly where his wife had been, and how she came down, the story which the defendant had told her, and was anxious to conceal from Derby. In that conversation with Derby, which was in the street in Jersey City, or shortly afterwards, he gave her $15 in money. She afterwards, under cross-examination, says that the conversation with Mrs. Derby; (and she had but one) was on the 24th, at her mother's. "She said, she met a gentleman and came down with him, and that he took the state-room in Mr.

Derby's name; *I don't exactly remember the rest of the conversation;*" yet she goes on to say, "she said she did not think there was actual harm in what she did," and then proceeds as if she did recollect. This differs entirely from the story in the direct examination, which is that the defendant had told her the name of the person she was going to meet. That she met a gentleman who took her to supper, and got a state-room for her, is entirely a different story, and with a different effect on the question, from the story that the gentleman she went to meet was Palmer. The one story supports the defendant's theory, the other that of the complainant. The whole effect of the testimony of this witness depends upon her recollecting the words used by the defendant. If she afterwards, from talking with Derby and others, drew a conclusion as to what the affair was, she would naturally construe this conversation to support it, and in fault of recollecting the words, would and might honestly use such as would express that meaning. I cannot believe that the witness recollects the words of that conversation with Mrs. Derby with sufficient accuracy to make it a credible confession of guilt. I am more inclined to believe the statement, "I don't exactly remember the rest of the conversation," than anything which she has sworn to. The testimony of this witness is open to further observations on her want of recollection and of accuracy, and the history which she gives of her own life. But the reasons which I have mentioned are sufficient to prevent any determination founded on her testimony.

The next testimony which I shall consider is that of John B. Sevar. I shall not comment at length on his evidence; I do not think it possible that any one accustomed to deal with evidence, upon reading his testimony, can place any reliance upon it. The highly improper course pursued by the complainant, and permitted by the examiner, of requiring his direct testimony to be read to him before the commencement of the cross-examination, shows that the complainant placed no reliance upon his statement of facts from his recol-

lection of them as they occurred, though he might rely upon his recollecting the statements of what he had before sworn to from a fresh reading. The irregularity is not sufficient to suppress the testimony, but in case of such a witness must almost destroy its credibility.

This witness who knew the defendant by sight from dining once or twice at the same table with her at the Rhinecliff House, who did not know her name or her husband, or whether Palmer was her husband or not, took a seat in the saloon of the boat, at a table where he was engaged in reading *Les Miserables* of Victor Hugo, and was in the midst of the absorbing description of the battle of Waterloo, yet particularly noticed the fact, that these two went to a state-room together, about nine o'clock, and that neither came out for the two hours while he sat there, and noticed that the key was turned in the lock inside. He was so struck with this incident, that he sometime afterwards *happened* to mention it to his lawyer who *happened* to be E. G. Waters, of 37 Wall street, whom Mr. Derby had employed to collect evidence against his wife.

Another witness to the steamboat charge, is Thomas Brown. Before this time he knew Derby by sight, and had seen Mrs. Derby with him and knew her as his wife. He saw her on the boat in company with a stranger to him, whom he knew was not her husband. He lived in Brooklyn, was sometimes over in Jersey City, at Taylor's Hotel, where he had seen Derby; but does not know whether Derby knew him. Before he had seen either of them go to the state-room, so far as appears, he went down to the clerk's office, and asked who occupied room 112, and was answered Derby. After this he took a seat in the saloon and was reading Harper's Magazine; he continued there from half-past eight to eleven o'clock, when he went to his state-room. He states that Mrs. Derby, and the man with her, went into the state-room 112, together, between nine and ten o'clock, and that he did not see either of them come out, and that *he thinks* that he should have noticed it if either had come out.

The testimony of this witness is entitled to consideration, though a stranger, about whom not much, if anything, is known; nothing is shown against his character; his manner seems that of a person desiring to tell the truth; the only doubt is whether the accuracy of his recollection is to be relied on. He took little interest in the event; although the only place to which he appears to have resorted in Jersey City was Taylor's Hotel, where Derby lived, he did not mention the matter to him until some eight months afterwards, when he heard others talking of it about the hotel. In eight months the recollection is much impaired, and the value of his evidence depends upon accuracy of recollection and the closeness of his observation. When the matter became serious he would naturally imagine that he had given it close observation at the time. Now, if the proof was that Palmer had gone into the state-room with Mrs. Derby and stayed there a few minutes or even half an hour, this alone, in the absence of all proof of any previous intercourse or conduct of a suspicious nature, would not raise a violent or even a strong presumption of guilt. Continuing all night would leave no doubt, and staying for an hour and a half, would raise a strong presumption. Now, whether he would with certainty have noticed his coming out a few minutes after entering, is a question upon which the court can judge as well as the witness. He says he thinks he would have noticed it. But if he was at all interested in his reading, it is very possible that Palmer might have gone out, and that in the bustle of the large number of passengers going in and out of these rooms at this hour of the night, he might not have noticed it. I am not willing to adjudge the defendant guilty upon this evidence, when the whole value of it depends upon the degree of attention paid by Brown. It is strange that a horse dealer, with a horse below upon the boat, would sit in that most uninteresting of places, the saloon of a steamboat, reading Harper from half-past eight or half-past nine to eleven o'clock in an evening, in the hot month of August, and not stir out to breathe the cool air or

to look after his horse. It is strange that he went to inquire for the occupant of the room before and not after he saw the suspected parties go in together, or that the mere presence of a man who might, for aught he knew, be a brother, or some like relative, should excite his watchfulness over a woman he had barely seen, in the absence of any conduct which could excite suspicion.

Another witness is Samuel P. Jones, of Oneida, New York, also a horse dealer, who was on this steamboat with a horse; he did not know either of the parties, except that having once been with a friend in Palmer's shoe store, at 53 Chambers street, he had seen Palmer selling goods, and heard his name. He saw Palmer with a lady who proved to be Mrs. Derby, at the supper table, and noticed them. He did not know but she was Palmer's wife. The next morning at six o'clock, the time of landing at New York, he was in the upper saloon, where he had been for one hour or an hour and a half, "*reading* and taking notes generally." He noticed Palmer come out of a state-room, and in a few minutes after he saw the lady come out. This fact, which is an ordinary occurrence on these boats, for some reason unaccounted for, struck him as remarkable. Jones told this story to a friend who told it to Waters, and Waters sent Jones to Clifton Place, with a letter addressed to Mrs. Derby; she came to the door, and he recognised her to be the woman. His story is a congeries of improbabilities so evidently got up for the occasion, that it merits no other remark. If it were otherwise, there is nothing in it to contradict the evidence of Mrs. Derby, who says that Palmer came into her room in the morning before she went out, and stayed some minutes, assisting her in getting ready to go out. Jones does not pretend that he watched this door for fifteen minutes before any one came out, and that in the bustle and activity in a steamboat saloon, at the hour of landing, no one could have gone in without his noticing it.

But there is other evidence to sustain this charge, of a kind entirely different, and not liable to any of the objections

taken to these four witnesses. It is the written confession of the defendant herself, not only signed by her, but sworn to before a master of this court. It was written and read to her by her husband, and again read by the master before she signed it. And he testifies that he cautioned her against signing or swearing to it if the contents were not true. This confession does not admit her guilt, but it admits that she met Palmer on the Dean Richmond by appointment; that Palmer took a state-room in the name of Mr. Derby, and that they both occupied it during the night. These facts are sufficient to sustain the charge of adultery. While it is possible that a man and woman of their ages may occupy the same room for a night without guilt, yet the presumption is strong against them, and in this court, it would, unless clearly explained, be always sufficient to sustain the charge. It is not usual to grant a divorce on a charge of adultery sustained by the confession of the defendant alone. *Miller* v. *Miller*, 1 *Green's Ch.* 139. But in this case it is shown that she left the Rhinecliff House under a false pretence to avoid the suspicion and interference of her husband's sister; that Palmer had twice visited her there and had opportunity to make the arrangement; that he waited on her on the boat, took the state-room for her, and was in it the next morning with her alone before her leaving it. These facts, if the confession is believed to have been fairly obtained and understandingly made, are sufficient to support it, so that this court may found its judgment upon it.

Her oath annexed to this confession neither adds to, nor detracts from, its weight. It was unwarranted and perhaps indiscreet for the counsel of the complainant to administer this unofficial oath. But it was natural, in his zeal for his client, who had five months before consulted him about this matter, that he should endeavor to make the admission as strong as possible. The defendant, while she admits her signature to the confession and to the affidavit, and that it was read to her, states in her testimony that it was made under these circumstances: That her husband on that day,

February 4th, 1867, sent for her to his office, showed her some New York bills of her contracting that he had received, gave her money to pay them, and asked her when she came back to meet him at his rooms at Taylor's Hotel; that she met him there, when having locked the door, he read to her this paper, prepared in his own handwriting; that she objected to the parts which stated that she met Palmer by agreement, and that they occupied the same state-room, and said to him, "Oh no, Will, that is not so." He replied that that was no matter, that Jackson (his counsel) said *that* could be without any criminal transaction; that he wanted her to sign the paper, and told her that he would hire a house and go to housekeeping with her; that she should retain her child, and that if she would sign, he would drive her home himself, and that would stop the scandal about the museum; (referring to an occurrence at Barnum's Museum a few months previous, when he came in with a strange woman, in his wife's presence, and when he found his wife was there the woman abruptly left, and he showed strong symptoms of agitation and irritation). That she was agitated and excited, and was willing to do anything to please her husband, and have his approval; that her husband went for Jackson, and locked her in his room until he returned. She admits that Jackson asked her if she signed without fear of her husband, but not that he read it or explained the contents. The defendant's account of what took place after Jackson came, differs in some material respects from the account given by him. As to these, preference must certainly be given to the testimony of Jackson, who is known as a counsellor of this court, of highly respectable standing. Yet some allowances must be made for him. The same ardor that when Derby requested him to take the acknowledgment of Mrs. Derby to this paper impelled him to substitute an affidavit, which he must have known was irregular and unauthorized, would now, in relating occurrences of two years since, insensibly influence his memory to recollect the occur-

ence in the light most favorable to his client, and the cause he has so zealously espoused.

We will take Jackson's statement as literally true, that as soon as he had read to her so much of the paper as made him aware of its nature, he ordered Derby out of the room, and read the whole carefully to her, cautioned her not to sign it, if the facts were not true, and that he chivalrously offered to stand between her and her husband's wrath, if she did not sign it; and then examine her evidence. What occurred before Jackson came, no one discloses but herself. Her husband, the only other person present, in this, as in all other matters in this cause, is not offered as a witness. If what she states is true, that she plainly told her husband that the two only important facts in this paper were not so, and that he replied they were of no consequence, and she then signed it to please and pacify him, the confession is of little or no value in this cause. She is a competent witness; her character for veracity is not impeached, nor is her character for chastity, except by the two charges under investigation; she indeed has a great interest in this cause, and in this very question. But it is in such cases that character is of value, and must be brought into account, and this testimony by her must be taken into · consideration, unless it is improbable of itself, or overcome by other proof. Jackson's testimony is of value to show that she was fully cautioned not to sign, if the facts were not true. Married women, we all know constantly sign deeds against their judgment and wishes, only to gratify the requests of their husbands, and to avoid the discomfort and annoyance which a refusal would cause, and solemnly acknowledge before an officer on a private examination, that it is done of their own free will. The step taken by Mrs. Derby was only one degree beyond this, and that consisted in this, that she did not only part with property, but acknowledge facts which might disgrace and ruin her for life. But if she did this under the assurance that the facts admitted did not compromise her, she might have done so. Yet it is an acknowledgment that few women

in their senses would have made if not true. And in order to believe it in her case, it is necessary to be first convinced that she was, by the difference in their nature, or by circumstances, under the control of her husband. From the facts in the case, the conclusion is unavoidable, that she was not a resolute, strong minded woman, but of a yielding, unresisting nature. She never else could have borne the treatment to which for years she has been subjected by her husband.

On the other hand, Derby appears to be a man of decided will; strong, resolute, and violent; and knows the value of energy and violent attitude in overruling more timid minds. His resistance to the remonstrances of James H. Burst, and above all his two letters to him, couched in the strongest language, and filled with invective and outrageous threats, show this character. He was abusing and threatening a man who had been doing only what his duty clearly required of him, trying to break off an intimacy between Derby and his sister, a girl of nineteen, which, to give it the best character, was indiscreet, dangerous, and calculated to destroy her reputation, and which in the end did effectually destroy it, whatever may be the fact with regard to her actual guilt. His violence succeeded in driving away a brother's protection, and ensuring a continuation of the intimacy. Such a will and temper was well adapted to operate upon the yielding nature of his wife, and to compel her to submit, as she had always done, to anything he might dictate.

Her situation, too, with regard to this trip, was calculated to constrain her. She had taken a bold step for a timid woman; she had gone to Albany to watch her suspected husband; she had left his sister's house under false and feigned pretences; she had met Palmer, who had waited on her, and whom she had, without doubt, taken into her confidence as to her object; he had been in her room alone with her. Her confidant had betrayed her, and had accepted fifteen pieces of silver from Derby. To tell him the truth would rouse him; the scene at the museum had exasperated him; and the life of quiet neglect to which she had become accus-

tomed, might have come to an end.   His promise of a home with him and her child, and to drive her home himself, and put an end to the scandal, which at least he performed, were calculated to have an effect upon her.   The only way to accomplish this end, was to perform the condition, and resolutely to sign the paper in disregard of Jackson's kind advice and admonitions, and of her own knowledge of the falsity of the facts.   I can readily conceive that this view presented itself, and it will reconcile her story with Jackson's, except in the details.   These I do not believe she could recollect with accuracy, even if Jackson can.

The manner in which the paper was presented, and the signature obtained, are much against it.   It was prepared in her absence, without her being asked or consulted about it. She was summoned in his room to execute it without knowing for what object her presence was required.   The paper was in her husband's handwriting.   She was urged by him to sign it, in a room locked up with him alone ; she was without friend or counsel.   Here the promises and inducements were offered, and she was kept locked up while he went for his counsel.   These things are not denied.   Confessions of a criminal under such circumstances are never even considered.   In *Miller* v. *Miller,* 1 *Green's Ch.* 139, this court disregarded a confession, because it inferred from the general conduct of the husband that it was made through fear.

The common law and the law of this court, make great allowance, and justly, for the influence of a husband over his wife.   She cannot be convicted of a plain larceny committed in his presence.   If she signs and swears to an answer in Chancery, together with her husband, it can never be used as evidence against her, whatever may be its effect as a pleading in the suit.   And this is so, however lawful the oath and indifferent the master.

This is not authority for rejecting this confession as evidence, but these principles must be kept in mind in determining the weight to be given to it.   I am constrained to

conclude that this paper was obtained from the defendant under circumstances which should give it no weight as evidence in this cause; and it fails to convince me of this adultery.

In my judgment, the adultery on the Dean Richmond is not sufficiently proved to be made the ground of a decree of divorce.

The other specification in the bill, is the charge of adultery on the 27th of October, 1866, with Palmer, at No. 53 Houston street, in the city of New York. The proof of this is by William P. Prentice; he deposes that on that day, at the complainant's request, he followed the defendant from Jersey City to New York; that she first went to Palmer's store, 53 Chambers street, and in fifteen minutes came out with Palmer; that they walked to Broadway, and up Broadway to White street, then got in a Broadway omnibus and rode up to Bleeker street, walked down Bleeker to Wooster, down Wooster to Houston, and down Houston to No. 53, a notorious house of assignation, or bed-house, into which they went, and remained for an hour and a half. He followed them there on foot when they walked, and rode on the omnibus when they rode; he stood on the opposite side of the street while they were in the house, and learned from a negro living in Houston street, and from a policeman, the character of the house. Palmer came out first; he followed him up to Broadway, then returned to his station. In about a quarter of an hour Mrs. Derby came out; he followed her home; she went up Broadway, stopped at 704 and 744, took the Bleeker street stage to the Cortlandt Street Ferry, and crossed at that ferry; it was about half-past one when she went over, and about half-past four or five o'clock when she returned. The character of the house, 53 Houston street, is shown by a witness, who was a policeman in that ward from 1864 to 1867. It was a notorious house for prostitution to which men and women openly resorted by night and by day for that purpose. It had been kept for years by a violent intemperate woman, known to the police as Irish Mag; she

kept no girls, but let a room and bed, for about a dollar, to any who desired to use them.

These facts if true are sufficient to establish the adultery; going to a house of that character with Palmer, remaining there the length of time stated, and going out separately in different directions, are circumstances that must compel any court to infer adultery, unless unmistakably explained by clear and credible testimony. The witness to the facts is Prentice; his testimony is positively denied by the defendant, and he is supported by no one, for the fact proved by Crandall that on that day he saw her and Palmer come out of Palmer's store and walk to Broadway, is an innocent one, and in no way tends to establish guilt. She admits that she called more than once at Palmer's store, and that he came out with her. But Prentice is a disinterested witness, and Mrs. Derby, though by law a competent witness, is directly and strongly interested in the result, and the charge is one which, above all others, would tempt to perjury in denial.

Courts of divorce were loth to grant a divorce for adultery on a charge sustained only by a single witness, without any corroboration or any circumstances rendering it probable, even when the defendant did not and could not deny the charge under oath. A denial under oath by the party subject to full cross-examination, must have some weight given to it. Yet I am not willing to hold that an act of adultery, or facts from which adultery must be inferred, when positively sworn to by one witness only, will not in any case be sufficient proof to sustain a decree of divorce, because denied by the defendant upon oath. In such case the conclusion must depend upon the probability of the story, the character of the witness, and consistency of his evidence, and perhaps somewhat on the character of the defendant.

The charge is, that a woman of good character, a wife and a mother, about two o'clock, in the midst of business hours, on Saturday, in the month of October, went into a store in one of the most respectable and frequented parts of the city, a few doors from the great store of A. T. Stewart & Co.,

when customers and other members of the firm were probably there, and in fifteen minutes took out a partner or salesman, a man against whose character nothing is shown, who had for many years been engaged in a respectable business, and that they proceeded walking and riding up Broadway at the hours when most thronged, openly and side by side, and went down Bleeker street and entered together a low, notorious bed-house, whose character was well known to the police, and to the residents of the vicinage. If both were depraved at the core, yet a slight regard to decency, or for that external reputation which both had hitherto kept up, or a very little reflection or common sense, would have suggested a different course to accomplish their object. The danger of being followed and watched, as they actually were by Prentice, would have suggested itself, even taking for granted that both were too much engrossed in the object in view to recognize Prentice, known to Palmer as the conductor of a street car in Jersey City, in which he used to ride the year before, and whom Mrs. Derby had seen working in her husband's lumber yard. The story is possible, but it seems to me very extraordinary and improbable.

Again: Prentice, when recalled, fixes the day as the 20th of October; in this, varying from the specification of the bill, and the day stated in his first evidence, and in such way that the 20th must be taken as the day, or Prentice wholly discredited. Mrs. Crandall, the sister of the complainant, says that Mrs. Derby left the Rhinecliff House on that day; that she was there from July 20th to October 20th. Now it is possible that Mrs. Derby, by taking an early train might have arrived at New York in time to have gone to her mother's at Clifton Place, and deposited her child and luggage, and returned to Jersey City in time to·cross the ferry at half past one. Yet we must believe that under that quiet, retiring demeanor, which so many of the witnesses took for an index of her modesty and chastity, there lurked fierce passion, of which she had now lost control, to urge her with such hot haste to rush to the store of her paramour,

seize on him in a few minutes and hurry him to the scene of her dishonor.   This supposition is possible but very improbable.

The history of the witness, Prentice, does not much commend him.   He was, at the examination in 1868, twenty-two years old, had no trade, and was not well enough to work.   He was living with a cousin in Franklin, Connecticut, and kept his trunk and clothes at his sister's, at Norwich, in that state; he had worked at the cigar business, in the screw factory, and at complainant's lumber yard, and, I think, had been in the army.   He had been a conductor on the Grand street horse car; he had been confined in the Hudson county jail, for what does not appear, and he was a brother of one of Derby's partners.   There is nothing in all this directly against his credibility or veracity, yet this history fails to indicate a person of that high toned character whose testimony will, some time, induce or compel belief of things very improbable in themselves.

This witness, when first examined, stated that the time was October 27th; that he made a memorandum of the date and gave it to Mr. Derby, adding, that he had a very good memory for dates, for a particular thing like that. The day in the bill is stated on the 27th, as if Derby or Jackson had taken it from that memorandum.   Jackson swears that Derby had consulted him about the divorce before this; and it would seem that if Derby would keep a memorandum of any date he would of this; and that the date on which he traced his wife with her paramour to such a house, would have been burned upon his memory.   This witness was not cross-examined.   But more than seven months afterwards, on the day when Crandall was examined, who testified that the day he saw Palmer and Mrs. Derby, was October 20th, Prentice was recalled by the complainant to testify that he had made a mistake in the date; that the real date was the 20th; that he had made a memorandum of the occurrence on the day at his brother's house, in his pocket diary; that the book had been since in his trunk, at

his sister's house, at Norwich, and that he got hold of it after his first examination; he produced the book, a diary for 1866, in which a memorandum is made, covering the spaces from October 20th to October 27th, inclusive, giving the history in nearly the same language and order as in his first examination, including the numbers 704 and 744. The similarity is so great as to give ground to the suspicion that one was taken from the other. And it is strange that the witness, who could not, without his memorandum, remember a single date, which, to him, seemed important, and for which he volunteered the assertion that he had a very good memory, could, without a memorandum, recollect two street numbers, associated with nothing; and although, according to this corrected testimony, he and Crandall must have been in Chambers street, at the same place, in front of No. 53, at the same time when Mrs. Derby and Palmer came out, they do not appear to have seen or recognized each other. And although Crandall told Derby on the same day what he had seen, and at Derby's request made a memorandum, yet he destroyed that memorandum before he was sworn. And Derby, who, if there is any truth in Prentice, must have been struck with the remark of Crandall when he received the report of Prentice that night, does not appear to have mentioned or made known to either the coincidence.

And there is a discrepancy between the momorandum and the testimony of this witness worthy of attention. In his testimony he states, "that on the 27th, I saw her pass Taylor's Hotel, in Jersey City, she was going towards the ferry, I saw Derby right afterwards coming down the street, he asked me to follow her to New York." The memorandum is, "saw Derby at Taylor's Hotel, he asked me to follow his wife, that she was coming down to the ferry." These accounts of the beginning of this affair are so essentially different in features that would attract the attention of one speaking *from memory*, that the mistake would not be made; it might, in the effort to recollect a fictitious memorandum. Memory would not confound a request made by

Derby standing at the hotel to follow his wife, who would soon come down the street, with one made by Derby coming down the street to the witness after he had seen Mrs. Derby go toward the ferry. Neither the character of this witness, nor the consistency of his testimony, are such as to sustain the extraordinary and improbable story told by him. Besides these views, the conduct of the complainant throws discredit on the testimony as to both these charges. It shows that he did not believe it himself.

The scene in Barnum's Museum was in November, 1866, a few weeks after the alleged Houston street affair. Derby had just caught his wife in a low, disgraceful, outrageous, act of incontinence. He must have been burning with shame and indignation at her conduct. His offence at the museum was apparently only accompanying a strange woman instead of his wife, yet the known and discovered guilt of his wife gave him no confidence to face her, his companion instantly disappeared when she saw they were noticed, and to his wife's moderate but decided reproach, he simply replied " don't make a damned fool of yourself," and made no allusion to her own deeper guilt. He went next morning to explain to her and her friend, Mrs. Anness, who was with her, saying it was an innocent young girl from the country, with whose mother he had boarded, and to whom he had promised to show the sights of the city. Mrs. Anness, who boarded with Mrs. Derby's mother from October, 1866, to May, 1867, and who must have been there at or just after the Houston street charge, says, he generally called there every morning. This conduct, in both respects, is entirely inconsistent with his belief in the story told by Prentice.

Again : the fact that Derby did not commence proceedings for eighteen months after the discovery of this conduct, and for more than a year after the confession, and not until after the death of Palmer, shows that he had no confidence in this evidence, or that he could succeed upon it until Palmer was dead. Palmer died in February, 1868; in March, Derby

gave positive orders to his solicitor to proceed, and on April 3d, the bill was filed.

The reasons for the delay attempted to be given through Jackson, are not satisfactory. The nice conscientious scruples may have influenced his counsel, but would not for a moment have been in the way of a man with force and will and temper to write the two letters to Burst. Besides, Jackson at last only put the delay on the ground that he should wait until he had sufficient proof; and if he believed the story of Prentice, or relied on the confession he had procured from his wife, he had ample proof after either.

This conclusion as to the charges against Mrs. Derby will relieve me from reviewing, at any great length, the charges of adultery by Derby, alleged in the answer by way of bar to the divorce.

The first charge is of adultery with Martha Burst. I consider this fully sustained by the proof; and that, without the aid of the rule adopted by the Ecclesiastical Court of England that the same fullness and cogency of proof will not be required to sustain adultery when pleaded in bar, as when alleged as the ground for the divorce. *Forster* v. *Forster*, 1 *Hagg. Cons. R.* 144; *Astley* v. *Astley*, 1 *Hagg. Eccl. R.* 714; *Bishop on Marr. and Div.*, § 398.

Martha Burst, when nineteen, had received the attentions of Derby in his wife's absence, had accepted presents of value from him, had gone out with him at night, and the matter proceeded so far as to cause much scandal. Her brother, who had confidence in her virtue, but not in her prudence, interfered. Both she and Derby resented this interference. She left her brother on pretence of going west, and came back to Jersey City and took board elsewhere, with strangers. The intimacy continued; the scandal grew. In June, 1864, Mrs. Hoagland, who had for many years kept a boarding-house in Grand street, and with whom she had boarded for more than a year, sent her away on account of the scandal. For some time before, the lady boarders in the house, for the same reason, had ceased to associate with her. When sent away she said nothing in her own defence, but

remonstrated against her brother attempting to control her conduct. Derby's business called him to Albany to buy lumber, and she had been seen at New York in the morning coming off a night boat from Albany, in company with Derby. Both she and Derby knew of the reports, of the opposition of her brother, and of her expulsion from the boarding-house. Yet, in the fall of 1864 we find Derby going up to Albany on the Saturday night boat; in the morning he met two young women from Jersey City; before he left the boat acquaintances of Martha Burst, he told them that she was staying at Albany; she was staying there temporarily with a friend, Mr. Romaine, whom she had visited several times before. Derby asked these ladies (two sisters, named Rodier,) if they would like to see her; at a note from him she came to the Delevan House, where all three had put up. After mid-day, or after Mr. Romaine's dinner, Miss Albina Rodier went with her to Mr. Romaine's, stayed a few hours, and when they left she told Mr. Romaine that she would not be back that night, but not in the hearing of Miss Rodier. She returned with Miss Rodier to the Delavan House, took tea, and Mr. Derby spent part of the evening with them; before eight o'clock she left, stating that she was going home; Derby offered to accompany her, and left with her. She did not go home to Romaine's that night. Miss Rodier saw nothing of either of them until next morning just before seven o'clock; Derby came first to the room occupied by her and her sister, ostensibly to inquire about their going to Troy; Martha Burst came in just after this, with her hair uncombed, and dressed in the same clothes she had worn the day before. She made some apology for her hair, and stayed to breakfast with them. In the meantime the room of Derby, which had been given to him on Sunday morning, next that of the Rodiers, on the second floor, had been changed for one on the third floor.

These facts, unexplained, lead irresistibly to the conclusion that Derby was guilty of adultery that night with Martha Burst. He had no other business at Albany on Sunday; he could not buy lumber until Monday; he knew Martha was

at Albany, which shows guilty understanding. He adroitly used the presence of the Rodiers as an excuse to get her to the hotel; she came at once—it showed her willingness. She deceived the Rodiers by the pretence of going home, having artfully concealed the declaration made to Romaine, and went off with Derby, alone, and returned the next morning in just such manner as is consistent with her having spent the night in his room. The intention and determination of both is sufficiently proved, and the opportunity to indulge was ample. She may have gone elsewhere, but in a subsequent conversation with Miss Rodier about this affair, she insisted that she went back to Romaine's, which it is clear she did not do.

His unsuccessful solicitation of Mrs. Vanderbeck, clearly proved, shows his disposition to be faithless to his marriage vows. Such repulsed solicitation by a complainant is not, of itself, a bar to a divorce, as was at one time intimated in the English courts; but it will support evidence, otherwise insufficient, of adultery with another. A disposition by Joseph would have made it easy for Potiphar to convict his wife of adultery committed with one less scrupulous.

These circumstances are not conclusive; they may be explained, but until explained, there is but one inference. No explanation is given. Either Martha Burst or Derby could explain them, if an explanation could be given. Both are silent. If innocent, Derby owed it to her and to her reputation to call upon her to give the explanation. She is alive, and her residence is known; her testimony could be easily procured. As the case stands, but one conclusion is possible.

The testimony is not sufficient to sustain the charge of his adultery with Margaret Morrow, now called Margaret Otis. And although there is cogent proof as to the charge with Jenny Fauselman, yet it is somewhat contradictory; and as that charge is not set up in the answer, and as it is not necessary for the determination of the cause to review it, I shall not give it any further consideration.