ESTHER A. EBERHARD, PLAINTIFF-RESPONDENT, v. FRED
EBERHARD, JR., DEFENDANT-APPELLANT.

Argued April 17, 1950—Decided May 8, 1950.

*Mr. Harold Sokobin* argued the cause for respondent (*Mr. Emanuel A. Honig* on the brief).

*Mr. Jules E. Tepper* argued the cause for appellant (*Messrs. Tepper, Tepper & Verney,* attorneys).

The opinion of the court was delivered by

CASE, J.  The appeal is by the defendant, Fred Eberhard, Jr., from a decree *nisi* of the former Court of Chancery which, on the wife's petition, awarded her a decree of divorce on the ground of adultery and, on the husband's counterclaim and the wife's cross-petition, adjudicated certain property rights between the parties.  The petition charged guilt with Mrs. Viola G. Harris "at various times between January 1, 1944,

and January 1, 1946, and at various places in the States of
New Jersey, New York and Pennsylvania and particularly
in and around Vernon, New Jersey, during the months of
November and December, 1945." Mrs. Harris did not inter-
vene, but she testified in the cause. The court below found
that adultery was committed at Sleepy Valley Inn, near War-
wick, New York, a few miles from Vernon, New Jersey, on a
Saturday night in October of 1945.

As to the divorce:—The question of inclination is not seri-
ously argued for the defense. The evidence of it is so over-
whelming that we shall not discuss the proofs thereon except
incidentally as occasion may arise with respect to opportunity.
The outstanding incident upon which the finding of oppor-
tunity was based centered at a small hotel and eating house
known as Sleepy Valley Inn, located in New York near the
town of Warwick and eight or ten miles from the town of
Vernon, New Jersey.

In the early fall of 1945 Eberhard made inquiry at the
Lockwood Agency, a real estate office at Newton, New Jersey,
looking toward the purchase of land in Sussex County, and
was referred to Louis P. Nash, who maintained a subagency
at his home in the town of Vernon. In making his initial
call upon Nash, Eberhard was alone, but on later visits he
was accompanied by Mrs. Harris. Nash interested Eberhard
in a portion of the acreage owned by Grant D. Sisco, then
township clerk of Vernon Township, and took Eberhard, and
later Eberhard and Mrs. Harris, to see Sisco. The testimony
of Mr. and Mrs. Nash and of Mr. Sisco and his daughter
Harriet definitely identify Mrs. Harris as, repeatedly, a com-
panion of Eberhard in that vicinity. Shortly after Eberhard's
first visit, Nash telephoned to him and made an appointment
for twelve o'clock of the following Saturday and asked him
to bring Mrs. Eberhard and have lunch at the Nash home.
Eberhard came, accompanied by Mrs. Harris. Mrs. Harris
was not introduced to the Nashes, but they, having asked the
defendant to bring his wife with him, assumed that the woman
was his wife and addressed her then and throughout their

subsequent interviews as Mrs. Eberhard. That was, of course, in Mrs. Harris' presence and hearing and was in the presence and hearing of Mr. Eberhard. Neither of them corrected that erroneous form of address or denied the marital relationship implicit therein. Accordingly, when Mr. Nash took Eberhard and Mrs. Harris to Sisco, he introduced them as Mr. and Mrs. Eberhard. Again there was no objection or correction. The couple accepted a form of address which is properly applied only to husband and wife and in turn were accepted by these people of Vernon as being husband and wife. Although Eberhard and Mrs. Harris deny that they were together in that vicinity on more than one occasion or that they were so addressed, their testimony is convincingly disproved by both of the Nashes and both of the Siscos, impartial and credible witnesses in whom no incentive for misstating the truth has been established.

Defendant concedes that he and Mrs. Harris went to the Nash home, met Mr. and Mrs. Nash and were their guests at luncheon; yet he insists that he did not introduce his woman companion to either of them. We are unwilling to make the incredible assumption that a man would bring a woman as his fellow luncheon guest to the home of gentle people without either introducing her or purposefully permitting his hosts to draw from the circumstances an obvious inference as to her identity. Likewise, Eberhard says that he did not introduce Mrs. Harris to Sisco. It is definitely established that Mrs. Harris did, in Eberhard's company, meet Sisco on more than one occasion; and here, too, the improbability that she would pass through those experiences without some sort of an identification gives force to the testimony by both Nash and Sisco that Nash, in Eberhard's presence, did introduce her as Mrs. Eberhard. That all puts Mrs. Harris in the posture, tolerated to the point of encouragement by herself and the defendant, of a wife to Eberhard. Both of those persons deny the premise and consistently offer no explanation. But the fact is found *contra* their contention, and we are brought to the conclusion that this passive holding out

of the relationship rested upon emotions which are rightfully incident only to that relationship.

The negotiations regarding the land progressed. Eberhard and Mrs. Harris, on another Saturday afternoon, were at the Nash home, and their conversation indicated that they were planning to spend the night at Sleepy Valley Inn. The next morning Sisco told Nash that the lines of the plot which Eberhard proposed to buy barred Sisco's access to his cow pasture and that he was, therefore, unwilling to sell by the description which had been mentioned. Nash, for the purpose of conveying that information, put through a telephone call to Mr. Eberhard at the Sleepy Valley Inn, and in a few minutes had Eberhard on the phone. That was sometime between ten o'clock and noon. Later in the day Eberhard and Mrs. Harris, constantly accepted by the Nashes as being Mrs. Eberhard, came to the Nash house and in the course of conversation said that they had been at the Sleepy Valley Inn, that it was a very nice place, that they liked it and that they had had a very nice breakfast. Both of them wore the clothes they had worn on the preceding day. On still another Saturday afternoon, at about dusk, Eberhard and Mrs. Harris drove up to the Sisco house. Eberhard told Sisco he would like the latter to take him around and show him the lines of the lot, that they were then on their way to New York State and would stop the next morning for the stated purpose. The car left headed in the direction of Warwick. The next morning was rainy and wet—not a day for walking over rough land. Nevertheless at about ten or ten-thirty o'clock Mr. Eberhard and Mrs. Harris returned from the direction in which they had gone and stopped at the Sisco house. The trip over the land was not then had.

A survey of the plot was made on or about November 12th. Sisco made delivery of the deed at the bank in Hamburg on or about the 25th of November. "About November 20th, 24th," he saw Eberhard and Mrs. Harris on the premises coming down from the field toward the road. Eberhard carried a gun and wore a hunting jacket. The three talked to-

gether, and Sisco pointed out the line between the purchased property and the land belonging to one Edward Stahily. Mrs. Eberhard, the petitioner, testified that on November 23rd and 24th her husband was away on what he had said was a hunting trip. On November 26th, after his return, she found in his hunting jacket several prophylactics or contraceptives. Those articles were not in use between the defendant and the petitioner, and they had not been in his hunting jacket a few weeks earlier when she was searching for some matches. Eberhard admits that his wife found those articles, as she testified, in his hunting jacket. He makes this weak explanation: "I don't recall where I got them. Someone might have given them to me and I stuck them in the pocket and forgot completely about them."

Eberhard caused a truckload of lumber to be delivered at the land he had purchased, and Sisco later believed that some of it was being stolen. In the effort to tell Eberhard of the theft, Sisco telephoned the office of the Star companies where Eberhard had been employed. He was told that Eberhard was no longer there and was given the suggestion that he telephone Eberhard's residence. In the meanwhile, on January 18, 1946, Eberhard and his wife had separated; Eberhard had taken up his abode elsewhere than at the former marriage domicile and had severed his relation with the Star companies. However, Sisco did call up the residence and talked with the real Mrs. Eberhard. Until that time Mrs. Eberhard had no knowledge that her husband had negotiated for or had purchased any land in Sussex County or that he, either alone or in company with Mrs. Harris, had been frequenting that locality.

When defendant learned that his wife knew about the land purchase, he went to Nash, said he was having some trouble with his wife, asked whether anybody had been up to see him, and on being answered in the negative said, "If anybody comes here, you don't know anything about it."

Petitioner and her attorney did go to that vicinity and visited Sleepy Valley Inn in the effort to obtain information

regarding the matters of late 1945 and early 1946 and particularly to get the names of the employees of the Inn during the period under inquiry. At the time of the visit by Mrs. Eberhard and her attorney, the man who operated the bar and dispensed the liquor and who had some incidental duties by reason of which he took the title of manager was one Scheible, who, however, had not been at the Inn until July of 1947. The record that answered for a register had obviously not been kept with much regard for accuracy or completeness. It bore such entries in lieu of names as "Three Featherbed Kids" and "Chick and Sally C." While the attorney was conversing with Scheible, a middle aged man and a young woman walked in with baggage and went upstairs without signing the register. The attorney asked of Scheible, "Don't they sign?" Scheible merely shrugged his shoulders; his explanation at the trial was that he is sure they must have signed later. Whether the entries mentioned above were pseudonyms of those who occupied rooms and did not care to give their correct names or were the attempts of various persons to be humorous, they demonstrate that the keeping of the register as a record was apparently not a serious undertaking on anyone's part.

During the visitation of the petitioner at the Inn on the tour of investigation, the proprietor was interviewed. If he, at the trial, had been put on the witness stand and, under the sanctity of an oath, and through the ordeal of cross-examination, had been able to repeat and maintain the statements informally made in response to inquiries put to him at the Inn, the result would have been quite an aid to the defendant. But the proprietor was not produced at the trial, and one is left to wonder whether the owner's replies to Mrs. Eberhard and her attorney were the result of a request similar to the one put to Nash, that he was not to "know anything about it." Certainly petitioner was given little help in her effort to learn the names and addresses of former employees. The man who was brought by the defendant from the Inn was Scheible, who was not on the premises during 1945 and

1946, and from his lips it was sought, unconvincingly, to bring into evidence what the proprietor had said in response to the inquiries so put. The periods at which the defendant and Mrs. Harris are said to have been in the Vernon area correspond with times when defendant was not at home. If Mrs. Harris, at those times, was, as she claims, at her own home, it would have been very helpful to the defendant's cause—and she clearly was trying to be helpful—had her father and mother, with whom she lived, been brought in to so testify. But they did not appear. The burden is upon the wife to prove her case and no item of proof essential to her case may be omitted and excused because of the weakness of the defendant's case; nevertheless the failure of the defendant to call available and valuable witnesses on vital points may seriously impair the integrity of the defense. *Cf. Black v. Black*, 30 *N. J. Eq.* 228, 231 (*Ch.* 1878).

The proof teems with incidents that have significant potentialities. On Sunday, November 18, 1945, Mrs. Eberhard found in the home a picture which her husband had inadvertently dropped; it was a "snap" of Mrs. Harris standing between a log cabin and Eberhard's car. The defendant's unsatisfying explanation is that the car was not his, that he had not taken the picture or been present when the picture was taken, that the picture had been "accidentally picked up in my office;" "I picked it up accidentally" and "stuck it in my pocket" and "somehow or other, in taking the papers out in my home, the picture was dropped on the floor, and that is where I believe my wife found it." He obtained the return of the picture from his wife and says that he gave it back to Mrs. Harris, because she had asked for it several times. The chronology of that occurrence synchronizes with the events at Vernon. It would have been easy for the defendant, through Mrs. Harris, to have produced that picture at the trial, and so to have demonstrated that the car was not that of the defendant and to have dispelled the inference that the picture was a photographic souvenir of a meretricious escapade. But the picture was not forthcoming.

The extent to which the defendant, by his own conduct, damaged the value of his testimony is further instanced by a matter that may be called "Tamarack." He had told his wife, in August of 1945, that over the week-end he was going to act as counselor at a Boy Scouts camp known as Camp Tamarack. There was doubt as to whether defendant had told his wife the truth about his presence during that period, and when he was on the witness stand he was cross-examined on it. He said that he had been taken to Camp Tamarack in a car with several other counselors, members of the Kiwanis Club, and he did not remember the names because the entire club took part in those activities; he did not even remember the name of the man whose car he went in. He was pressed by the court to name at least one of the several men who he said were members of the Kiwanis Club and went with him as counselors and he replied that he thought Dr. Walter Miller, a man at the time prominent in Kiwanis Club activities, was one of them. Had the occurrence ended there the mistaken testimony might have been charged to a faulty memory, although his lack of knowledge about the location of Camp Tamarack encouraged doubt whether he could have driven there and back and remained so ignorant, not only about the place itself, but about the men in whose company he went. But after the court session the witness telephoned to Dr. Miller, told him what had been said in court and said he would appreciate it very much if Dr. Miller would go along with his testimony. Dr. Miller had not gone on such a trip, had never been away with the defendant and the Kiwanis Club had not conducted such activities that year; and Dr. Miller so told the defendant. Later, the day before the next hearing, Eberhard called personally on Dr. Miller for the purpose of asking whether "anyone had talked" with him. He was told that both Mrs. Eberhard and her brother had done so and was informed of the gist of what had been said. The next morning Dr. Miller was in court under call by petitioner. On continued cross-examination defendant admitted that probably he did not attend the Boy Scout function at any time

in 1945. As the recital of his movements was given by Eberhard to his wife concurrently with the period to which it related, the statement to her was an obvious lie told as a cover to conceal other activities; and it may logically be deduced that his original statement on the stand was also a conscious lie which, on prodding from the court, led to a contemporaneously invented detail that he could not maintain.

There was no witness of the act of adultery. The proof is purely circumstantial. But adultery or any other issue may be proved by circumstantial evidence. The test is in the cogency of the circumstances. The proof must have sufficient probative force to support a legal inference as contrasted with a mere speculation. A leading case in this state on the establishment of adultery by circumstantial proof in a divorce action is *Berckmans v. Berckmans,* 16 *N. J. Eq.* 122 (*Ch.* 1863); affirmed, 17 *N. J. Eq.* 453 (*E. & A.* 1864). At *page* 140 the rule is stated thus:

> "To establish the existence of adultery, the circumstances must be such as would lead the guarded discretion of a reasonable and just man to that conclusion. It must not be a rash and intemperate judgment, moving upon appearances that are equally capable of two interpretations. * * * Where the conduct of a party admits of two interpretations, equally consistent with probability, the one involving guilt and the other consistent with innocence, the rule of evidence as well as the dictates of justice, require that the interpretation should be favorable to innocence."

The opinion states this supplemental rule:

> "In order to prove adultery by circumstantial evidence, two points are to be ascertained and established; the opportunity for the crime, and the will to commit it. Where both are established, the court will infer the guilt."

Recent citations of that decision are contained in *Wagner v. Wagner,* 140 *N. J. Eq.* 213 (*E. & A.* 1947), and *Bingenheimer v. Bingenheimer,* 2 *N. J.* 284. The rule is still alive and pertinent. The problem, here and always, is to apply the rule to the facts of the case; and the heart of the rule is that where there are two interpretations of the conduct of the

accused party, *equally consistent with probability*, the one involving guilt and the other consistent with innocence, the interpretation should be favorable to innocence, and that, further, to justify a finding of adultery, the circumstances must be such as would lead the guarded discretion of a reasonable and just man to that conclusion. The real question before us is whether the proof focusing upon the Vernon country and Sleepy Valley Inn is as equally favorable to innocence as it is to guilt.

The defendant and Mrs. Harris did not approach that critical experience as celibates unaccustomed to the satisfaction of sexual impulse. They had both known life in its fullness. Mrs. Harris was a married woman, whose husband, when her first relationship with Eberhard began, was alive, overseas with the armed forces. His death occurred at about or shortly after what is commonly called the end of the war—VE Day. Eberhard developed a coolness toward his wife and no longer shared her bed or room. His infatuation with Mrs. Harris was notorious in his business and social circles. The impudence and the disregard of the opinion of others with which the affair between the defendant and Mrs. Harris was carried on is well exemplified by the appellation of "Lover" and "Lover Boy" which gained currency for Eberhard among the fellow employees of himself and Mrs. Harris; by his explosive statement to his wife, when she asked about the talk at the factory, that "he didn't give a damn whether there was any talk about them (the defendant and Mrs. Harris) or not; he would do what he wanted to do, when he wanted to do it, and where he wanted to do it; that that was his business, and nobody's business but his;" and by his retort, when chided by his brother-in-law, that "he would sleep with whom he damned please." But the affair at Vernon was clandestine. It might even be said that the two were masquerading as husband and wife; certainly there was a degree of marital intimacy in which Mrs. Eberhard did not share. She had no knowledge of the search for land and the purchase of it. She was ignorant of the fact that a woman was participating

in that adventure with her husband, accepting the form of address that was hers exclusively. Eberhard and his companion, deliberately and repeatedly, assumed that counterfeit position and experienced the zest that would come from such an adventure. Things being thus, "Mr. and Mrs. Eberhard," of a Saturday afternoon, as we have seen, visited the Nashes and spoke in such terms that the next morning Nash assumed that he could reach them at the Sleepy Valley Inn and did get Eberhard on the telephone at that address. Presently "Mr. and Mrs. Eberhard" drove up to the Nash home and used commonplace expressions, which, with what had transpired before, are inconsistent with the hypothesis that they had not spent the night at the Inn. Later, when it became an issue whether the two had spent the night there, they did not say that they had done so and that in so doing had occupied separate rooms (there being two and only two guest rooms in the place). They denied the incident *in toto;* a denial which might well, if sound, have been bulwarked by the evidence of the proprietor of the Inn, or if in fact Mrs. Harris was, as she says, at home, by the evidence of those with whom she lived. Not only did Eberhard deny having stayed overnight at the Inn, he denied ever having been there until October, 1947, after he had heard the name mentioned in court at one of the hearings in the present proceeding, when he went "to find out what it was all about." The Sunday telephone he says was not to him from Nash, but was from him to Nash, and that Eberhard did the telephoning from Livingston. Mr. and Mrs. Eberhard resided in Livingston. The house telephone bills show no such call for October or November; and Eberhard did not indicate that he telephoned from another number. Both Nash and Mrs. Nash agree that the telephone was by Nash to Eberhard at Sleepy Valley Inn and that a few hours later when the couple came they said they had been at the Inn.

There was the later Sunday afternoon when the couple drove up to the. Sisco home on their way to New York State and made an appointment for what we are persuaded was to

be their return trip the next morning. The morning brought foul weather, wholly unsuitable for land inspection, which would not cause people to leave home for that purpose. But when people are away, they must come back, regardless of the weather, and so the two returned from whence they had gone. Again, Sisco, by accident, meets the couple coming down from the lonely recesses of the field toward the road and Eberhard is wearing the hunting jacket in which Mrs. Eberhard, a few days later, finds the contraceptives which the defendant thinks someone must have given him.

This is a bitterly contested case. There is not and could not well be the slightest suggestion of collusion. Facts, therefore, may be evaluated for what they appear to be and without the discount which the possibility of collusion might engender. The plaintiff has the burden of proving her case and of proving it according to the standards already stated; but the law gives a spouse the right to divorce an offending mate and the courts should not emasculate that right by requiring certainty of proof to a degree made unattainable by the conditions under which we live. Universal use of speedy automobiles difficult of pursuit, frequently impossible of undetected pursuit; good roads leading, not only through well settled areas to populous centers, but also through lonely stretches to distant isolation; a plethora of roadside cabins and other places of private resort without meticulous registration or close identification of guests; these and other modern facilities create opportunities for acts of intimacy which are exceedingly difficult to be proved. Each case must, beyond fundamental rules, be decided upon the complex congeries of facts of which it is composed; and the decision furnishes little precedent for the disposal of later cases, just as it is not tightly controlled by the determination of earlier ones.

The conduct of the defendant does not, in our opinion, admit of an interpretation of innocence of equal probability with an interpretation of guilt. We are convinced beyond a reasonable doubt by the proofs and the fair inferences, as was the Advisory Master, that the defendant and Mrs. Harris spent

the night in question together at Sleepy Valley Inn. From that follows the inference that an act of adultery was then and there committed.

▮ As to the adjudication of property rights:—Emil E. Hollander was the father of the petitioner. He and one Peterson owned three affiliated corporations known as the "Star" companies. They were the Star Electric and Motor Company, the Star Equipment Corporation and the Star Machine and Engineering Corporation. It was by those affiliated companies that Eberhard was employed. When Fred Eberhard married Esther Hollander, he was earning $90 weekly. By reason of his new family connection he was advanced rapidly. Within a short time he was increased to an annual salary of $12,000 and later one of $22,000. It is more than a justifiable inference that his wife's influence contributed to the lucrative development. That contributing factor did not make common property of his earnings, but it afforded an atmosphere friendly to an agreement which Mrs. Eberhard testifies was entered into, and which we find was entered into, whereunder the two were to bank their income in a fund as to which they would be partners; each with authority to check therefrom and each to have an equal interest therein. The account was opened at the Bloomfield Bank and Trust Company. There were really two accounts, a checking account and a savings account, but the checking account is the item of chief controversy. It is defendant's contention that this was originally his account, that he incorporated his wife's name in the account for convenience in drawing checks, but that the moneys were essentially his, that purchases or investments made therefrom are his, and that his only obligation to his wife is to repay, as loans, such sums as she may have put in the account. He relies upon *Fretz v. Roth*, 70 *N. J. Eq.* 764 (*E. & A.* 1906); *Beck v. Beck*, 78 *N. J. Eq.* 544 (*E. & A.* 1911); *Morristown Trust Co. v. Capstick*, 90 *N. J. Eq.* 22 (*Ch.* 1919); affirmed, *sub nom. Morristown Trust Co. v. Safford*, 91 *Id.* 152 (*E. & A.* 1919), and *Kelly v. Kelly*, 134 *N. J. Eq.* 316 (*Prerog.* 1944), which, however pertinent to the factual

contention which he asserts, are wholly inapplicable to an account maintained in partnership by agreement. The instant proceeding is between the parties themselves and in this phase is resolved into a partnership accounting. *Cf. Goc v. Goc,* 134 *N. J. Eq.* 61 (*E. & A.* 1943). The facts regarding the opening of the account are clearly stated by the vice-president of the bank. After the first day the account was entitled "Fred Eberhard, Jr. or Esther Eberhard." It was opened by Mr. Eberhard on July 1, 1942, in person with a deposit of $447.30. The bank followed the practice of not accepting a two-name card unless both parties were present. Mrs. Eberhard was not there, and for that reason the account on that one day was in the name of Fred Eberhard, Jr. The next day the technicalities were met and the account was duly authenticated in both names as stated above. Both signature cards are dated July 1, 1942, the day the account was opened. It is apparent that it was the purpose of the depositors to have the account in both names from the very beginning, and that it was only an oversight, corrected within twenty-four hours, which prevented that from being done. The proofs do not sustain the argument that the account was the husband's account, composed only of his moneys, with checking privileges in his wife for domestic convenience. The deposits through the years doubtless were mostly of his pay checks; but the silent influence of his marital connection upon that source of income was manifested in the termination of his employment forthwith upon his separation from his wife. Moreover, Mrs. Eberhard's substantial dividend moneys went into the account. Some of the dividends on the Star stocks passed through the husband's name, but his ownership was nominal, as will presently be shown, and the real ownership was in the wife, a circumstance which emphasizes the ready merging of money interests until the husband, by his infidelity, disturbed the domestic unity. Before the Bloomfield account was opened, and while the wife was still working, after the marriage, her earnings went into an account in a Belleville bank which, as we gather from proof that is not precisely clear, was

carried in the husband's name; a fact to which we do not attribute great importance beyond the willingness of the parties to "lump" their income in a common fund. That account was permitted to dwindle. It was not transferred to the Bloomfield Bank and seems now to have only a trifling balance. If anything be needed by way of confirmation that the husband's understanding, also, was that the two had equal title to the funds in the Bloomfield bank, it is to be found in his action after the separation of the parties but before the property issue was raised. On or about January 26, 1946, he sought and obtained from the bank a cashier's check for $3,000, which was in round numbers one-half of the balances shown at the beginning of that day in the checking and savings accounts. It happened that earlier on the same day Mrs. Eberhard had closed out the accounts; so that at the time the cashier's check was issued there were no funds against which such an issue might be made. The bank, having carelessly and inadvertently issued the cashier's check, secured the return of it from Mr. Eberhard, who thereupon complained to his wife about her act in withdrawing the *entire* account, saying that the check *he* had drawn represented only *the half* of the fund and that he had left the other half for her. The incident fairly reflects what Mr. Eberhard, before he grasped the legal implications, considered was his share of the account; and that share is credited to him in the balancing of the item.

The financial partnership ended with the break between husband and wife and at practically the same time with the severance between Eberhard and his employment—all in January of 1946. Two years later, in January of 1948, Eberhard testified that he had been unable to obtain other employment; that he had worked three months with the City Tank Corporation, earned about $1,000, couldn't get along with the owner and quit; that he had formed a connection with the A. C. Boyd Insurance Agency to work as agent on a commission basis; that his total earnings therefrom were approximately $300; and that at the time of testifying he had about $14 in bank and was without income except his aforesaid

commissions on the sale of insurance. Comparing the experiences during the partnership with those which followed its termination, it would seem that Mrs. Eberhard's value as a producer in the partnership was far from nil and that her contribution, direct and indirect, justified her interest as an equal partner.

The partnership principle carried over into other assets, well illustrated by defendant's paragraph 15 of his counterclaim as follows:

"15. In the month of December, 1945, petitioner and defendant did agree that defendant was to purchase for petitioner and defendant a number of shares of stock of the Isthmus Pacific Railroad Company for the sum of $3,000.00, and that both petitioner and defendant were each to pay one-half of the said sum of $3,000.00. Defendant, in accordance with this agreement, purchased the aforementioned shares of stock for the sum of $3,000.00, and requested that petitioner pay, to him the sum of $1,500.00, being her share of the purchase. Although often requested to make such payment petitioner has refused and continues to refuse to make such payment. Said shares of stock have now become completely worthless and of no value whatever, and will not have any value or worth in the future, and defendant is therefore unable to reimburse himself for the sum due and owing to him from petitioner by the sale of the aforementioned stock."

The claim was later withdrawn, for reasons that are problematical. But the making of it gave striking corroboration of the wife's contention that their money matters were on a partnership basis. As the money used in the purchase of the stock came from the joint checking account, which we have decided was a partnership fund, the loss from the transaction was equally borne.

The finding that the money in the Bloomfield Bank and Trust Company was a partnership fund controls the ramifications branching therefrom. The investment and use of those funds were for the benefit of the partners; both profits and losses were subject to equal division. The husband was the active partner; the business ventures financed from that fund were managed by him, usually with the knowledge and consent of the wife, who trusted him and his judgment implicitly in the making and shifting of investments. This was true of the

two stockbrokers' accounts, one in each name, carried with Laidlaw and Company. Eberhard would now have it believed that all such transactions, no matter in what name conducted, were financed by his money and were his property. We find contrarily on the ownership of the funds used and, largely but not entirely because of that, upon the interest in the ventures which arose from them and articles bought with them. Thus the brokers' accounts, and the two automobiles purchased with partnership funds, were partnership property, subject to the allowance, granted in the court below, to Eberhard for that part of the purchase price of the automobiles which was represented by the trade-in of a car previously owned by him individually. When the Laidlaw brokerage account was opened in Mrs. Eberhard's name, her husband said that his account was getting "top-heavy" and inasmuch as they were partners in everything an account should be opened for her to match his, and that he would handle it; and he did handle it. When five thousand dollars was checked by Laidlaw to Mrs. Eberhard from her brokerage account the check was deposited in the joint Bloomfield bank account, and when the brokerage account was in need of funds thirty-six hundred dollars was checked into it from that joint account. On one occasion the Laidlaw account in the name of Mrs. Eberhard checked to her the sum of four thousand dollars and Eberhard used that money to open another brokerage account with, or to purchase investment holdings in his own name from, a broker named Williams. Starting, as we must, with our finding that the joint account in the Bloomfield bank was a partnership account, in which each had an equal interest, the pyramiding and mingling of those funds into and with other ventures and the cross-mingling of the moneys of those ventures with each other lead to no intelligible conclusion other than that the entire series of transactions was, as Mrs. Eberhard contends, and as Eberhard seems to have conceded in the remark attributed to him above, a partnership.

It appears that a substantial volume of government "E" bonds was, through Eberhard's employer, purchased in

both names by retention from defendant's salary checks. Having in mind the well known and quite generally used attribute of such bonds which permits that practice unattended by the incident of partnership, we do not deduce a partnership interest from the mere fact of purchase. To the extent that the proceeds from the bonds were placed in the account at the Bloomfield bank, they became, under the partnership agreement, along with all other deposits therein, partnership property, but so long as they retained their separate character, and were not made the subject of a particular agreement, they remained the property of the defendant within the scope of the accounting now being effected. We are unable, from the voluminous record, to determine necessary facts about the issue and the history of those bonds. The court below will review the proofs, and at its discretion take added proofs, on that limited question and decide the same.

██ A further item of dispute is the right to the proceeds from the sale of stock in the E. R. F. Realty Company. The court below found factually that the stock was purchased with funds from the common bank account, a finding which has support in the testimony and which we accept. It follows from the line of reasoning followed herein that the proceeds are partnership property and were properly treated as such.

██ Early in 1943 Mr. Peterson died, and under the impact of that death and the distribution of the Peterson stock in the Star companies among the members of the Peterson family, Mr. Hollander decided to distribute the major part of his stock between his wife and children. The plan was announced to the family. Eberhard expressed to his wife the wish that her share be placed in his name for the purposes of the prestige that would go with it and of identifying him more closely with the family. Mrs. Eberhard asked her father to transfer the stock accordingly, and Mr. Hollander said that he would put it "in Fred's name" if it would make him feel better, but the stock was to be her stock. Eberhard took the stock with that understanding and forthwith executed a will to give effect to it in the event of his death. In January

of 1946, the defendant, on the termination of his employment, said to Mr. Hollander, "I will sign it (the stock) over to Esther because it belongs to her. That is her stock." He accordingly assigned the stock, and the same was transferred to Mrs. Eberhard. The lower court determined that the stock was the property of Mrs. Eberhard and that she need not account for it. We are in accord with that determination.

Our study of the pleadings, the proofs, the interchanges between counsel, the computation made by the court below and the request by that court that counsel check the figures brings us to the conclusion that appellant is mistaken in considering that the savings account in the Bloomfield bank was not included in the computation.

Finally, as to the controversy about the ownership of the household goods:—It would indeed be a wise judge who could, with entire accuracy, determine ownership as between a husband and a wife who over many years have accumulated the tangible makings of a home, some bought by one, some by the other, some by both, some received by gift, even wedding gifts; all intended for, and applied to, common use and enjoyment. The fact that one bought an article, or that the other bought another article, is frequently inconclusive. The decree directed:

"The household goods consisting of the furniture and oil painting, one set of crystal, and the dining and livingroom rugs, and in the possession of the petitioner, were owned by the petitioner and the defendant as tenants in common. Petitioner will pay one-half of the value thereof to the defendant and if the parties cannot agree upon a value, a distribution in kind or a sale shall be had."

Under the circumstances of the case we can devise no more equitable scheme of adjustment.

Petitioner's counsel was allowed a counsel fee of $1,750, to be paid by defendant, who asks that the award be reversed or reduced. An allowance was manifestly just, and we are unable to say that the amount was excessive. The nature of the defense and the defendant's departure from the truth made the prosecution of the suit difficult, laborious and

expensive. Much professional time was required in the ascertainment of the facts, in the preparation of the case for trial and in the actual trial, to which was added the expense of employing investigators. The hearings extended through nine court days spread from September 25, 1947, to January 30, 1948. It is asserted by counsel for the petitioner that the amount is not the major part of her expense in and about the litigation. Application for alimony was denied. Under all of the circumstances we find that the allowance should not be disturbed.

The net result is an affirmance throughout, with the exception of the item of government bonds, upon which we have stated an applicable rule somewhat different from that followed by the court below. That item will need to be examined anew and a fresh finding made thereon.

The record will be remanded to the Superior Court, Chancery Division, for further consideration not inconsistent with this opinion.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE and BURLING—3.

*For reversal*—Justices HEHER and WACHENFELD—2.