79 N.J. Super. 124 (1963)
190 A.2d 882
DOROTHY LOWENSTEN, PLAINTIFF-APPELLANT,
v.
HOWARD ALVIN LOWENSTEN, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 1963.
Decided May 8, 1963.
*126 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Seymour Margulies argued the cause for appellant (Mr. Albert J. Hordes, attorney; Messrs. Levy, Lemken & Margulies, of counsel).
Mr. Walter D. Van Riper argued the cause for respondent (Messrs. Van Riper & Belmont, attorneys).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This litigation began in July 1958 as an action for separate maintenance. By amended complaint filed in April 1959 plaintiff sought a divorce on grounds of defendant's extreme cruelty and his adultery with a number of named women, and also payment to her of one-half the value of the household furnishings and other personal property in the home alleged to be owned in common. Subsequently the adultery charges were withdrawn as to all but three corespondents, whom we designate for present purposes as Mrs. G., Miss C. and Mrs. I. These women were all patients of defendant, a successful practicing dentist in Jersey City.
*127 After a very extended and bitterly contested trial wherein 1500 pages of testimony were taken, and in which each of the alleged adulteresses appeared by counsel and asserted her innocence, a Chancery Division judge found neither the extreme cruelty nor adultery charges adequately proven or corroborated and dismissed the complaint. There was no specific adjudication in the opinion or the judgment as to the cause of action for property. Plaintiff appeals.
The parties were married in 1954. The only child of the marriage died shortly after birth in 1957. Plaintiff was in her early twenties, defendant about twice her age, when they married. She had been his dental assistant for some eight years before the marriage and gave him occasional professional assistance thereafter. He seems to have had no other or regular dental assistant. They lived, together with his mother, in a large house in which he also maintained his dental offices. Plaintiff continued her education on a part-time basis after marriage, securing a college degree from an institution in New York. She had almost achieved her doctorate when this action began. During the period of the alleged adulteries in this case plaintiff routinely was away from home Monday and Thursday afternoons and early evenings, attending classes in New York. She also regularly had dinner with her parents Friday evenings (without defendant). (The significance of these facts will appear hereinafter.) The parties lived comfortably during their cohabitation, frequently attended theatre and the opera, and made several extended vacation trips abroad. Their home was well furnished.
The evidence in this case makes it fairly apparent that defendant had unusual or abnormal sexual or quasi-sexual interests or pre-occupations, but that plaintiff tolerated them until April 17, 1958, probably because of defendant's financial ability to provide well for her. The central issues herein are whether the proofs, which in some respects are quite unusual, adequately establish either extreme cruelty or adultery; to what extent defendant's activities, relied upon to prove such *128 charges, were condoned by plaintiff, and whether any condonation was discharged by subsequent conjugal unkindness by defendant. We refer to the discussion hereinafter of the specific legal issues involved for further particularization of the material proofs.

I.
Plaintiff's assignments of acts of extreme cruelty are in two categories: (a) defendant's alleged erotic exploits, and (b) miscellaneous abuse, beatings and unkindnesses. We consider the latter first.
The episode of most substance was a physical conflict between the parties on February 17, 1958, when defendant discovered that plaintiff had extracted from his trousers pockets slips of paper containing the name and home and office telephone numbers of one of his patients, a Miss B., as to whom plaintiff entertained suspicions. He attempted to forcibly retrieve these slips from her, and in the ensuing scuffle she was struck and thrown, requiring medical treatment. As a result, plaintiff left the home and remained with her parents until April 6, 1958, when she returned upon defendant's promise not to repeat such conduct. We agree with the trial court's characterization of this episode as an isolated incident. It does not manifest and is not part of a pattern of behavior threatening the life or health of plaintiff or calculated to produce such wretchedness as would undermine the future performance of her marital duties. See Friedman v. Friedman, 37 N.J. Super. 52 (App. Div. 1955), certification denied 20 N.J. 135 (1955). This conclusion applies also to the other previous occasional unkindnesses and indignities complained of (not including the alleged infidelities), which we need not detail, when considered in the context of their remoteness and of the intervening enjoyment of normal marital relations between the parties and the acceptance by plaintiff from defendant of the many comforts and luxuries referred to in the opinion of the trial court.
*129 The alleged incidents of extreme cruelty of an erotic character are best described in conjunction with the charges of adultery, as they present a composite and integral picture of the defendant's personality and activities, and of plaintiff's reaction to them, which must be appraised as an entirety in judging their factual impact.

II.
On June 7, 1956 plaintiff left for her regular Thursday college class in New York, but returned early because of illness due to pregnancy. She testified that when she arrived at home she found defendant and Mrs. G., a patient, in the nude having coitus on the dental office couch. Plaintiff's testimony as to this incident is replete with clinical detail which we need not discuss. Plaintiff left the marital bedroom at once and slept on the third floor of the house for three weeks. Upon defendant's overtures to her for reconciliation and his promises to behave properly thereafter, and because of her pregnancy, she resumed cohabitation with him. At the trial defendant denied the accusation and explained this occurrence as involving his carrying Mrs. G. to the couch because of her sudden loss of consciousness from pain while he was removing a denture from her mouth, at which juncture plaintiff arrived and accused them of misconduct. Mrs. G. also denied the incident on the witness stand. However, in both an answer and an amended answer, filed by different attorneys on his behalf about a year apart, defendant admitted this specific accusation of adultery with Mrs. G. and pleaded condonation. Defendant testified that his attorneys mistook the facts in admitting the adultery. Moreover, in an entry on one of a series of memorandum slips secreted by defendant under cover in the backs of his professional diaries (discussed further hereinafter) defendant noted, under date of June 7, 1956: "Grz caught!" This was explained by defendant on the stand as meaning that the denture "caught" in the frenulum (a tissue) of Mrs. G's mouth as he was removing it. Moreover, on the slip for July 1956 there is an entry on the *130 8th: "Grz consult," and on that of September 1956, entries on the 26th and 27th reading, respectively: "Call from Grz," and "Call from Grz don't call again."
Plaintiff testified, partly on direct examination and partly on cross-examination, that in December 1957 she found defendant in the office waiting room with a patient, Miss B., referred to above, his arm around her, and overheard him assuring her of relief of a pregnancy he was inferably responsible for. While defendant concededly denied his responsibility for the girl's condition to plaintiff at the time of the incident, plaintiff testified on cross-examination that she visited the girl's home in Leonardo and was told by the girl's mother in her presence that defendant was responsible for her pregnancy.
The resumption of cohabitation of the parties on April 6, 1958, as already noted, lasted only until April 17, 1958. On that day, testified the plaintiff, she entered defendant's office to find him in a passionate embrace with and familiarly caressing the body of Miss C. After upbraiding them she at once telephoned her father and asked him to take her to his home. Mr. Zelop, the father, testified that when he arrived the plaintiff told him, in defendant's presence, what defendant had done, and that the latter admitted it to him, saying "I guess I lost my reasoning." Both plaintiff and her father also testified that at her request he at once took her to Miss C's home to confront the latter, in her mother's presence, with her guilt; and that Miss C. hung her head, broke into tears, and asked plaintiff not to leave the defendant on her account. Miss C. testified, denying any impropriety with defendant. She admitted the visit of plaintiff and her father, but denied their testimony as to her reaction to plaintiff's accusation of misconduct with defendant, and asserted that she and her mother on that occasion reproached plaintiff for falsely charging her to be defendant's mistress. Miss C's mother, however, was not produced as a witness.
In December 1957 plaintiff took from one of defendant's desk drawers a number of his annual office diaries, through *131 the year 1956, in order to check her suspicions as to which of defendant's female patients he was seeing on the Monday, Thursday and Friday afternoons when plaintiff was regularly out of the house. She testified that after the April 1958 separation she examined these books more closely and found concealed in the back of each of them the memorandum slips referred to above. These were introduced in evidence and have been examined by us, along with the diaries.
There was a series of 12 such slips, one for each month of the year, in each diary. One side of each slip contained notations of receipts of money from patients. The other side listed a day of the month, the first three letters of certain patients' last names and a word or lettered symbol of some type, or a combination of these. All these latter names were of female patients only. Many of the symbols referred to "M" or "MEN," which defendant admitted referred to the fact or progress of the patient's menstrual period. One symbol frequently found was "COIN," which plaintiff said meant, "coitus interruptus," a practice she and defendant indulged during part of their cohabitation to avoid her pregnancy. She also testified, and he admitted, that he noted her own menstrual periods in his diary as a guide for preventing conception. Samples of numerous other interesting entries in the secreted slips were, "kissed," "tea" or "tease," "cucumber," "IN! NOCO," "1x [apparently "first time"] coin excellent," "kissed 3x non response," "1x coin almost cl," "co 1/2 in," "cum finger 1/4 in," etc. For none of these entries were there consistent or compatible notations of treatment of the particular patients on the date indicated in defendant's regular dental diary, the latter containing only conventional entries as to ordinary dental treatment. Defendant vaguely mentioned a "master diary" but never produced it. He did not explain why the slips were secreted in the back cover. Moreover, one of the slips in the back of the 1956 diary contained what plaintiff's attorneys describe as a "tally sheet" where defendant had listed a number for each of nine patients for each month of the year, which number roughly corresponds *132 with the number of entries of occurrences (whatever they were) listed for the given patients on the individual monthly slips. There was a total for the year of 37. Plaintiff testified that when she discovered these secret entries and called defendant's attention to them he admitted they represented sexual experiences with the patients identified and promised to close his office and become committed for psychiatric treatment.
Defendant testified, undertaking to explain the concealed entries in question as related to private research he was conducting on gum disorders. He did not explain why his research did not include male subjects. Menstrual periods were, he said, correlative with abnormal gum conditions. So, also, were a patient's tensions or nervous condition. Thus, for example, "coin" meant "continuous inhalation"; "c.l.," "conversation long"; "tease," a "surgical procedure"; "kissed" indicated "canker (kankre) injection sites epithelium denuded." Defendant produced a dental expert purportedly to corroborate the foregoing explanations. Suffice it to say the proffered support for defendant's explanations was, in our view, weak and unconvincing. We do not know what most of the symbols represented, notwithstanding our suspicions. However, we deem defendant's explanations for the most part contrived and unconvincing, in the light of all the attendant circumstances.
Plaintiff's implication of corespondent Mrs. I. is based almost exclusively on such entries; so, too, as to Miss C., except for the observed occurrence of April 17, 1958. There were many such entries for Mrs. G.
On April 23, 1958 plaintiff found concealed in defendant's effects a motion picture film, introduced in evidence and viewed by the trial court, in which defendant is shown inserting a speculum into the vagina of a nude female in his office. Defendant explained this as medical research being conducted by him jointly with a physician since deceased. Plaintiff also found pictures of patients of defendant dressed in bathing suits, and a postal card and letter from women containing *133 sexual implications. Defendant offered evidence the film was taken in 1949 or 1950, before the parties' marriage. The trial judge so found, as against evidence by plaintiff indicating a later time.

III.
The trial judge erred in finding that the eyewitness testimony of plaintiff as to the adultery with Mrs. G. was not legally corroborated by the admissions of that fact in defendant's answer and amended answer, taken with the other circumstances shown.
The court's view that an admission in an answer in a divorce proceeding is not sufficient proof or corroboration because of the danger of collusion, while in line with general statements as to the insufficiency of uncorroborated admissions by parties, see Herr, Marriage, Divorce and Separation, 11 N.J. Practice, § 1399, p. 631; § 1389, p. 609 (1950), is subject to an important qualification where the action is closely contested. The general rule is based upon the danger of collusion. Where an action is strongly litigated, however, the interests of the search for truth should exert greater influence, the fear of collusive admission not being reasonably implicated. The less the reason to suspect collusion, as from the way the case was conducted, the more liberal should be the application of the requirements of corroboration in relation to admissions, the ultimate determination on the facts resting upon the probability in reason of the asserted hypothesis in the light of all the proofs and circumstances, including those attendant upon the admission relied upon. See Stewart v. Stewart, 93 N.J. Eq. 1, 4 (Ch. 1921); Parmly v. Parmly, 90 N.J. Eq. 490, 498 (Ch. 1919); Miller v. Miller, 2 N.J. Eq. 139, 142, 143 (Ch. 1838); Rogers v. Rogers, 89 N.J. Eq. 1 (Ch. 1918); 17 Am. Jur. Divorce and Separation, § 420, p. 543; cf. Schmidt v. Schmidt, 29 N.J. Eq. 496 (Ch. 1878) (emphasizing the undefended nature of the suit); Jones v. Jones, 17 N.J. Eq. 351 (Ch. 1866); Derby v. Derby, 21 N.J. Eq. 36, 51, 52 (Ch. 1870).
*134 Our courts have in recent years repeatedly stated and applied the jurisprudential philosophy that where the reason for a rule of law does not exist the rule itself will not be permitted to subvert the search for truth and justice. Where a divorce action is as bitterly contested from the very beginning as this one was, there is no sound reason to withhold the probative weight rationally to be attributed to two separate and deliberate formal admissions of an adulterous act by answer, particularly when the defendant at the same time denied all other charges of adultery and attempted to avoid the effect of the act admitted by pleading condonation. Cf. Stewart v. Stewart, supra, 93 N.J. Eq., at p. 4. If additional corroboration were needed, it is afforded by defendant's private confession in his secret memorandum on the date referred to: "GRZ caught!," and to his additional memoranda that "GRZ" had called him later and he had (inferably) told her not to call him again. For present purposes we may even discount the numerous other esoteric references to "GRZ" on the private slips in 1955 and 1956. It is noteworthy, however, that defendant's regular dental diary for 1956 shows no appointments for Mrs. G. for that year at all. (Defendant explained he made no regular appointments for Mrs. G., it being understood she could come in on any Thursday to have her gums observed.) It also may be significant that almost all notations for Mrs. G. in 1955 and 1956 are for Mondays or Thursdays, and that the regular 1955 diary entries are generally for from 4 P.M. to 6:30 P.M., on such days, when plaintiff was expected to be away from home.
In our judgment, the evidence as a whole, particularly the admissions in the answers drawn by competent counsel (one of whom tried the case for defendant) who were not produced to testify in support of defendant's present contention that they were mistaken as to what he told them in filing a confession and avoidance of this adultery charge, constitutes clear and convincing proof of defendant's guilt of adultery with Mrs. G. on June 7, 1956, notwithstanding his and her denial, and we so hold. The proofs are such as "would lead *135 the guarded discretion of a reasonable and just man" to the indicated conclusion. Eberhard v. Eberhard, 4 N.J. 535, 546 (1950).

IV.
The last stated determination requires an investigation as to whether the adultery with Mrs. G. was effectively condoned by subsequent cohabitation. The trial judge did not pursue this inquiry because, as indicated, he found insufficient proof of adultery at all. Condonation of a matrimonial offense by cohabitation is always conditional, at least for a reasonable time, see Welch v. Welch, 34 N.J. Super. 197 (Ch. Div. 1955), upon the forgiven spouse's refraining from subsequent acts of conjugal unkindness, and the reviving act of unkindness need not rise to the gravity of an independent statutory matrimonial offense, Herr, 11 N.J. Practice, op. cit., supra, § 789, pp. 200, 201. In the present case, accordingly, defendant's guilt of the alleged amatory adventure with Miss C. in his office of April 17, 1958, if established, would clearly revive the condoned offense of adultery with Mrs. G., even though not found itself to amount to or furnish sufficient evidence of adultery. Id., at p. 202. It is the very type of conduct from which a once outraged wife would particularly expect her erring husband to refrain as a condition of his continued absolution. The trial judge made no specific finding of fact as to whether the alleged occurrence with Miss C. had taken place. He merely appraised the evidence for its sufficiency to establish guilt of defendant's alleged adultery with her and found it lacking for that purpose. With that conclusion we are in agreement. But a finding of fact as to whether defendant kissed and caressed Miss C. on the occasion and in the manner testified to by plaintiff becomes essential in connection with the condonation issue for the reasons stated.
There is much support in the surrounding circumstances for the truth of plaintiff's version of the Miss C. incident *136 of April 17, 1958. Significant are her immediate call upon her father, and their confrontation at once not only with defendant but admittedly also with Miss C. at the latter's home, as well as plaintiff's leaving defendant on that occasion never to return, after having reconciled with him on April 6, 1958, only 11 days before. There may also be significance in the failure of defendant and Miss C. to produce her mother as a witness. However, we have concluded that the element of credibility of the witnesses from their demeanor and manner in testifying remains so weighty a factor in resolving this crucial issue of fact that the first-instance determination thereof should be made by the trial judge rather than us. We have therefore decided to remand the cause to the trial court for the purpose, inter alia, of having the trial judge make original findings of fact on this issue and enter such new judgment, if any, which such findings may require, consistent with this opinion.

V.
Plaintiff argues also that any condonation by cohabitation of the adultery with Mrs. G. is abated not only by the incident with Miss C. on April 17, 1958 but also by all of the other cruel acts of defendant complained of which occurred subsequent to the adultery mentioned. Indignities and unkindnesses might, as already noted, abate a condonation although not independently constituting acts of extreme cruelty sufficiently grave to found a judgment nisi. Plaintiff realizes, however, that the last cohabitation, that of April 6 to April 17, 1958, would ordinarily itself operate as a new condonation of all matrimonial offenses which went before. But she argues that the April 6-April 17 cohabitation did not wipe out the effect of previous conjugal unkindnesses in abating any prior condonation of the 1956 adultery because that cohabitation took place in ignorance of the full scope of defendant's previous misconduct. This factual assertion is predicated upon plaintiff's claim that she did not know of the secreted *137 memorandum slips until April 24, 1958, during an interlude when defendant was trying to win another reconciliation with her. She then allegedly scrutinized the diary books more closely and for the first time found the slips. See the discussion of facts infra, VIII. The trial court made no finding of fact on this issue.
As a matter of law, cohabitation by a wife after suspicious conduct by her husband will not constitute condonation of actually committed matrimonial offenses of which the wife did not then have "particularized and substantiated knowledge" obtained by her later. Kress v. Kress, 1 N.J. 257, 260 (1949).
Plaintiff's contention that she did not find the secreted slips until April 24, 1958 is not necessarily credible. She had possession of the diaries in which they were secreted since December 1957. She testified on cross-examination that prior to April 24 she was not "too conscious" of the existence of these notes in the back of the diaries. We conclude that the trial court should on the remand make factual findings as to when plaintiff found the notes and such legal conclusions as are necessary in relation to the issue of condonation insofar as plaintiff asserts that condonation of the 1956 adultery was abated by subsequent conjugal unkindness (aside from the episode with Miss C. of April 17, 1958).

VI.
We agree with the trial court that proof of adultery is not adequately established either with Miss C. or Mrs. I. Any such conclusion as to either would have to be founded, particularly in the case of the latter, on acceptance of the secreted memorandum slips as satisfactorily establishing the occurrence of sexual intercourse between defendant and the women identified therein. The entries, although justifiably generating some suspicion, are insufficient for such purpose. To a large extent they may merely evidence sexual-psychopathic fantasies in the mind of defendant rather than actualities, *138 although, as we find, certain matters recorded therein did occur. In the case of Mrs. I., there is no other evidence at all of adulterous inclination by defendant. As to Miss C., even if the disputed incident of April 17, 1958 occurred in fact, we would still not deem a finding of adultery justified on no more than that circumstance plus the secret memorandum references to this woman, as against the explicit sworn denials of adultery both by her and defendant. As to plaintiff's burden of persuasion under the rigorous standards of proof fixed in adultery cases, see Eberhard v. Eberhard, supra, 4 N.J., at p. 545.

VII.
If the alleged episode of April 17, 1958 with Miss C. actually occurred, this, along with some or all of the following  defendant's keeping of the secret memoranda, his alleged adventure with Miss B., his informing plaintiff, according to her testimony, that it was true that he had improper relations with all the women named in the memoranda (whether or not one concludes that all or any of these acts had in fact taken place), taken cumulatively with the other assignments of extreme cruelty cited by plaintiff, and referred to above as not alone sufficiently establishing extreme cruelty, may amount to a case of extreme cruelty in entirety if given credence to sufficient degree. Findings of fact and corresponding conclusions as to whether defendant's whole alleged course of conduct or any parts thereof constituted extreme cruelty are not made in the opinion of the trial court (except to the limited extent already noted). Such findings and conclusions should be made by the trial court upon the remand. Whether or to what extent any extreme cruelty which may be found was condoned, or whether any such offense condoned was revived by later conjugal unkindness, is left for determination by the trial court in the light of the principles set forth in this opinion.

*139 VIII.
Defendant argues that whether or not plaintiff previously condoned any misconduct by him, or whether defendant breached the conditions of any condonation by plaintiff of any previous adultery or extreme cruelty by anything he did in relation to Miss C. on April 17, 1958, or otherwise, plaintiff wiped the whole slate clean again by forgiving him on April 23 and April 24, 1958.
The testimony indicates that defendant made renewed overtures to have plaintiff come back to him on the dates last mentioned. During this interlude, he wooed her with a $10,000 cash gift, by giving her access to his bank vault, buying tickets for a joint European vacation, and by shopping for an apartment with her so that they might live elsewhere than at his offices, as she had desired. On April 24, 1958 she promised him to return to him the next day. She explains her failure to do so by her suspicion at his insistence that when she returned she should bring with her the office diaries she had taken, her consequent investigation of the back of the books, and her ultimate discovery on April 24, allegedly for the first time, of the secreted memorandum slips discussed above. So shocked was she at these discoveries that she decided not to return to him. Defendant, on the other hand, argues she must have found these slips long previous to the date indicated, having had the diaries in her possession since December 1957, but that she selfishly got defendant to turn $10,000 over to her on the promise of a reconciliation she never intended to effect. We have hereinabove, in another connection, ordered a finding on this issue of fact on the remand.
It is clear to us, however, regardless of when plaintiff discovered the secreted notes, that the events of April 23 and April 24, 1958 do not amount in law to a condonation of past marital misconduct by defendant. It has been stated that aside from acts amounting to an estoppel, nothing short of a renewal of sexual relations will amount to a condonation. *140 Herr, 11 N.J. Practice, op. cit., supra, § 788, p. 196; Goeger v. Goeger, 59 N.J. Eq. 15 (Ch. 1900). Forgiveness by mere words or promises not followed by restoration of the forgiven party to the matrimonial home and bed will not suffice. Ibid. The circumstances shown do not establish condonation by estoppel. We thus do not find condonation from plaintiff's implied promises to defendant on April 23 or April 24, 1958 to return to him, even were we to reject her factual explanation as to why she did not return.

IX.
There remains, finally, the matter of plaintiff's claim for a share in the allegedly jointly owned personal property. The trial court did not deal with this claim either in the opinion or the judgment. We do not know whether anything transpired at trial level indicating an abandonment of this claim by plaintiff. Nothing before us is illuminative. She pursues the claim upon this appeal, but defendant has not answered it in his brief. It should be disposed of by the trial court on the remand by appropriate findings and amendment of the judgment.
Affirmed in relation to the claim of adultery with Miss C. and Mrs. I. Remanded to the Chancery Division for further proceedings consistent with this opinion in the following respects: (a) finding of fact as to the alleged conduct of defendant and Miss C. on April 17, 1958, and consistent conclusion of law; (b) in the event of an affirmative fact-finding of (a), findings of fact as to extreme cruelty on the case as a whole, as to condonation in relation thereto, and consistent conclusions of law; (c) findings of fact as to when plaintiff discovered the secret notes in defendant's diaries, and conclusions as to the effect of such findings on plaintiff's contention that she did not knowingly condone or recondone defendant's adultery or extreme cruelty; and (d) findings of fact and conclusions of law as to the property claim. Both sides should *141 be accorded an opportunity to be heard on all issues specified on the remand. We do not retain jurisdiction.
GAULKIN, J.A.D. (dissenting).
My esteemed brothers find the adultery with Mrs. G. proved, and I agree. However, although they concede "[t]here is much support in the circumstances for the truth of plaintiff's version of the Miss C. incident of April 17, 1958," they remand for the trial judge to resolve that issue of fact in the first instance. In my judgment, the evidence establishes beyond any reasonable doubt the truth of plaintiff's version of defendant's misconduct with Miss C. Therefore, it seems to me that the remand (which will doubtless be followed by another appeal) will fruitlessly prolong this litigation, already pending since 1958. I would therefore reverse and direct that a divorce be granted to plaintiff because of defendant's adultery with Mrs. G.
Although I think the evidence preponderates in plaintiff's favor on the issue of extreme cruelty as well, since that is not as clear as the adultery, I would have no objection to a remand if that were the only issue, but since I feel the divorce should be granted forthwith for the adultery, I see no purpose in remanding for the purpose of the trial court's examining the extreme cruelty further.